CITY NAT. BANK OF BIRMINGHAM v. DUN et al.

(Circuit Court, S. D. New York. July 16, 1892.)

1. PRINCIPAL AND AGENT—FRAUDULENT REPRESENTATIONS OF AGENT.
A principal is civilly liable for the fraud and deceit of his agent which was committed for the principal in the course of and as a part of the agent's employment, and within the scope of his authority, though the principal did not in fact authorize the practice of such an act. Kennedy v. McKay, 43 N. J. Law, 288, distinguished.

2. SAME—MERCANTILE AGENCY.
Defendants, constituting a mercantile agency, agreed to furnish plaintiff, through its subagents, information concerning the mercantile standing and credit of merchants; defendants not to be responsible for the negligence of its agents in procuring information, and not guarantying the correctness thereof. Held, where defendants' agent, in reply to their call, knowingly gave false information concerning the standing of a merchant with intent to mislead plaintiff and benefit said merchant, and plaintiff sustained loss thereby, that defendants were liable, the agent's action being within the scope of his authority, and for and upon the business of the defendants.

At Law. Action by the City National Bank of Birmingham, Ala., against Robert G. Dun and others. Judgment for plaintiff. Defendants move for a new trial. Denied.

Lorenzo Semple, for plaintiff.

Wm. W. MacFarland, for defendants.

SHIPMAN, Circuit Judge. This is a motion by the defendants for a new trial of an action at law to recover damages incurred by the plaintiffs by reason of the fraud committed by the defendants' agent, acting as such, and in the course of his agency. The complaint was in the nature of an action for deceit, and treated the fraud of the agent as that of the principals, who were in fact ignorant of it. The defendants constitute a "mercantile agency" in the city of New York. The plaintiff is a bank in Alabama which became a subscriber to the said agency, under a written contract of which the following are the material portions:

"Memorandum of the agreement between R. G. Dun & Co., proprietors of the mercantile agency, on the one part, and the undersigned, subscribers to the said agency, on the other part, viz.: The said proprietors are to communicate to us, on request, for our use in our business, as an aid to us in determining the propriety of giving credit, such information as they may possess concerning the mercantile standing and credit of merchants, traders, manufacturers, etc., throughout the United States and in the dominion of Canada. It is agreed that such information has mainly been, and shall mainly be, obtained and communicated by servants, clerks, attorneys, and employes, appointed as our subagents, in our behalf, by the said R. G. Dun & Co. The said information to be communicated by the said R. G. Dun & Co., in accordance with the following rules and stipulations, with which we, subscribers to the agency as aforesaid, agree to comply faithfully, to wit: * * * (2) The said R. G. Dun & Co. shall not be responsible for any loss caused by the neglect of any of the said servants, attorneys, clerks, and employes in procuring, collecting, and communicating the said information, and the actual verity or correctness of the said information is in no manner guarantied by the said R. G. Dun & Co. The action of the said agency being of necessity almost entirely confidential in all its departments and details, the said R. G. Dun &

Co. shall never, under any circumstances, be required by the subscriber to disclose the name of any such servant, clerk, attorney, or employe, or any fact whatever concerning him or her, or concerning the means or sources by or from which any information so possessed or communicated was obtained."

The plaintiff, having been solicited to discount the acceptances of W. A. Kitts, of Oswego, N. Y., applied to the defendant for information in regard to his mercantile standing and responsibility. The defendants and their Oswego agent knew that this information was asked for for the use and benefit of the subscriber in its business, viz., that of aiding the inquirer to determine the propriety of giving credit. In reply to the defendants' call upon their Oswego agent for such information, he sent them a written statement, which they furnished to the plaintiff, upon the strength of which, and in reliance thereon, it gave Kitts credit and discounted his acceptances, which were not paid, and the amount of which the bank lost.

The court charged the jury as follows:

"For any loss occasioned by the neglect of these employes in seeking and obtaining accurate information, Dun & Co. are not responsible. For losses occasioned by the indolence or carelessness of the employe, which causes the information to be inaccurate, Dun & Co. are not liable. Neither do they guaranty the actual truth or correctness of the information. But, notwithstanding that these employes are the subagents of the persons who seek the information, they are also employed by, and are paid by and are legally, as well as in popular language, the agents of, Dun & Co. For losses occasioned by the willful fraud, and not by the mere carelessness or ignorance, of the agents, in committing information known by them to be untrue, and with intent to mislead the inquirer, the defendants are liable, if the plaintiffs, having placed reliance upon the fraudulent misrepresentations, gave credit in consequence of such fraud, and were lured thereby to their pecuniary loss and damage. In this case, the business of the firm of R. G. Dun & Co. was to furnish information to subscribers who had employed them for that purpose for a pecuniary consideration. If in the discharge of the duties of an employe, and in undertaking to furnish information in reply to an inquirer, and acting in the business of the agency, Mr. Burchard knowingly gave false information with intent to deceive the inquirer, the defendant is liable, although Burchard's private inducement to commit the fraud was desire to help Kitts. The questions of fact in any contested case become at least three in number: (1) Were the statements untrue at the time they were made? (2) were they known by the agent to be untrue at the time, and did he then act fraudulently with intent to mislead the inquirer? for that he knew that the information was sought for the purpose of aiding the inquirer to determine the propriety of giving credit to the person inquired about is palpable; and (3) did the plaintiff, relying upon the truth of the information, give credit upon the faith of the untrue representations, and thereby incur a loss?"

The jury found for the plaintiff. There was no question of fact in regard to the scope of the agent's authority, and the information was communicated to the defendants by the agent in the regular and usual course of his agency business. The defendant's argument upon the motion for a new trial was directed to two propositions, the first of which is that an innocent principal is not liable in an action of deceit for the fraudulent representations of an agent, although the principal, in ignorance of the fraud, receives and retains the fruits of it. It is not de-

nied that, if suit is brought by the principal to enforce the contract, the fraud is a defense, and that, if the deceived person institutes a suit to rescind the contract on that ground, the misrepresentations are imputable to the principal, because it is inequitable that he should retain the fruits of fraud; but it is claimed that an action of deceit cannot lie in favor of the injured party against an innocent principal. It must be universally conceded that the language of the text writers, the *dicta* of the early English cases, and the decisions of the courts of high authority in this country were in favor of the principle that a principal is civilly liable for the fraud and deceit of his agent which was committed for the principal, in the course of and as a part of the agent's employment, and within the scope of his authority, though in fact the principal did not authorize the practice of such an act. Story, Ag. §§ 139, 452; 1 Pars. Cont. 62; *Locke* v. *Stearns*, 1 Metc. (Mass.) 560; *Olmsted* v. *Hotailing*, 1 Hill, 317; *White* v. *Sawyer*, 16 Gray, 586; *Bennett* v. *Judson*, 21 N. Y. 238; *Hern* v. *Nichols*, 1 Salk. 289; *Wilson* v. *Fuller*, 3 Q. B. 68; *Ormrod* v. *Huth*, 14 Mees. & W. 651; *Murray* v. *Mann*, 2 Exch. 538.

But it is said by the defendant that later English cases, and a well-considered modern case in New Jersey, have denied that an action of deceit would lie against an innocent principal; and the cases of *Udell* v. *Atherton*, 7 Hurl. & N. 170; *Bank* v. *Addie*, L. R. 1 H. L. Sc. 146; and *Kennedy* v. *McKay*, 43 N. J. Law, 288,—are cited. An examination of each of those cases shows that the old doctrine was not denied that the principal is liable whenever his agent, who is, at the time, acting within the scope of his authority and for the principal, makes a fraudulent misrepresentation which influences and is acted upon by the plaintiff to his injury, but that the cases turned upon the question whether the alleged agent was, under the circumstances in each case, acting within the scope of his authority. *Udell* v. *Atherton* was tried at *nisi prius* by Baron MARTIN, who nonsuited the plaintiff. A commission merchant sold for the innocent defendant to the plaintiff a log of mahogany, the soundness of which the commission merchant fraudulently represented, knowing the untruthfulness of his assertion. The appellate court was equally divided, two judges holding that the defendant was liable, inasmuch as he had received and retained the fruits of the fraud, and two judges holding that he was not liable. It is apparent from the opinion of the two (MARTIN and BRAMWELL) who were in favor of the defendant that the case depended in their minds upon the fact, which they deemed to have existed, that the selling agent was not in fact authorized to make the representation, and that his situation before the buyer or the public was not such as to bring the representation he made within the scope of his authority. Baron MARTIN said tersely: "The true rule is that, wherever an agent acting within the scope of his authority makes a fraudulent misrepresentation, his principal is liable." The case of *Kennedy* v. *McKay* in 43 N. J. Law, 288, also turned upon the fact that the alleged agents were without authority to make representations, and exceeded the manifest scope of their authority in

so doing. The case of *Addie* v. *Bank* was, in brief, as follows: Addie bought of the bank 135 shares of its stock, induced thereto by false and fraudulant annual statements of its directors to the shareholders, and by the fraud of the manager, who falsely caused an agent of the bank to represent to Addie that a purchase would be a good investment. The bank became insolvent, went into liquidation, and Addie presented his claim against the bank to recover the damages arising from the fraud. It is true that there are *dicta* of the judges who gave the chief opinions in the house of lords, which assert the doctrine of the present defendants, and which, not taken in connection with the facts of the case or with other portions of the opinions, justify the reliance which is placed upon them by the defendants' counsel; but an examination of the whole case shows that one of the decisive facts upon which it hinged was the lack of implied authority in the directors to make representations upon which a sale could be based. This sufficiently appears from Lord CHELMSFORD's statement of the true ground upon which a corporation can be held liable for the statements of its directors. It will thus be seen that the cases upon which reliance is placed show nothing more than a disposition on the part of English judges to demand that, when an innocent principal is made liable, it shall clearly appear that the fraudulent agent was not acting outside the known scope and power of his agency. But the question was re-examined, in the light of the *Addie Case*, in *Mackay* v. *Bank*, L. R. 5 P. C. 394,—a case in which no doubts of the extent of the agency existed,—and it was held, without hesitation, that "in an action of deceit, whether against a person or a company, the fraud of the agent may be treated, for the purposes of pleading, as the fraud of the principal," and the language of Lord WILLES in *Barwick* v. *Bank*, L. R. 2 Exch. 259, is approved:

"The master is answerable for every such [fraudulent] wrong of his servant or agent as is committed in the course of his service and for the master's benefit, though no express command or privity of the master be proved."

The defendants' second point is that they are not liable, because the motive which induced the agent to commit the fraud was a desire to benefit Kitts, and that an "innocent principal is not liable where the agent made the fraudulent representations which produced the injury, not for the employer, but for his own interest and to serve his private ends." This form of statement is another manifestation of the strictness with which some of the English courts require that the agent must be acting for the principal and within the scope of his authority in making the representations, and, if he is committing the fraud for his individual ends, he cannot be considered, under their decisions, as acting for the principal, although his statements related to matters about which he was authorized to give answers. Whether the same conclusion would be reached by the courts of this country is a point which I do not intend to consider. The facts in the case of *British Mut. Banking Co.* v. *Charnwood Forest Ry. Co.*, L. R. 18 Q. B. 714, which the defendants cite, clearly illustrate the nature of the cases to which the proposition

applies. Customers of the plaintiffs applied to them for a loan on the security of transfers of the debenture stock of the defendant company. The plaintiffs' manager asked the defendant's secretary, who said that the transfers were valid and the stock existed. The plaintiffs made the advances. The secretary and one Maddison had fraudulently issued certificates for debenture stock, and these transfers related to a part of this overissue. Plaintiffs lost their security. The false statements were made in the interest of the secretary and Maddison. The court held that the secretary was held out as a person to answer such questions as were put to him on behalf of or for his employes, but when, in answering inquiries put by third persons, he made statements in his own interest or to assist his friend, and not on the bank's account, he was not acting for the defendants. But it must be clearly understood, as is laid down by Lord ESHER in the same case, that the language of the books, which speaks of acts or representations of the agent "in the interest of the principal" or "for the benefit of the principal," is not limited to acts which result in the pecuniary benefit of the principal. This language is "equivalent to saying that he must act" for "the principal, since, if there is authority to do the act, it does not matter if the principal is benefited by it."

The circumstances of this case show that the Oswego agent was plainly acting within the scope of his authority and for his principal. The plaintiff, one of the customers of the defendants and a subscriber to their "mercantile agency," asked the defendants for information which, for a money consideration, they had undertaken to furnish. The defendants wrote to their agent for this information. He fraudulently furnished them with false statements, which they sent to the plaintiff to be acted upon. The agent's action was most plainly within the scope of his authority, and for and upon the business of the defendants. The private motive which induced him to defraud is immaterial.

The two questions which have been considered constitute the vital ones in the case. There are others which, if they resulted favorably to the defendants, would simply send the case back for a new trial,—a result which, as the defendants' able counsel admitted, would be valueless to them if their legal liability in this form of action was established, —and therefore were merely stated upon the brief.

There were several exceptions upon the trial to the admissibility of testimony contained in the depositions. The depositions on both sides were taken upon the theory that the individual opinion of the witness in regard to Kitts' financial standing was admissible. This whole class of testimony was endeavored to be ruled out upon the trial. The questions that were admitted and were excepted to. related to the known financial standing of Kitts in the community, rather than to the individual opinion of the witness as to his proper *status*.

The defendants among other requests asked for the usual charge that the burden of proof was upon the plaintiff. The court intended to comply with the ordinary custom, and charge accordingly, but the matter escaped his memory. The judge's attention was not called to the omis-

sion, but the exception was a general one. A decision is not placed upon the ground that the exception was general, because it may be said there the court permitted such an exception. Whatever may be the proper consequences of this omission upon a writ of error, it is of no importance in this case upon a motion for a new trial, for the omission resulted in no injury to the defendants. The only question in dispute was that of fraud, and the affirmative testimony in regard to this point was abundant and perfectly convincing. The deposition of Kitts left no doubt of the untruthfulness of the agent's assertions, and the testimony of the agent in his own favor, though he was carefully led by the defendants' counsel, had no weight with those who heard it. A charge in regard to the burden of proof, in this case, would have been a mere formality. The motion for a new trial is denied.